[No. 1915. Decided July 19, 1897.]

CHARLES S. HINCHMAN, *Respondent*, v. POINT DEFIANCE RAILWAY COMPANY *et al.*, *Defendants*, JOHN C. LEWIS, *as Trustee, Appellant.*

APPEAL — EFFECT OF PARTIAL REVERSAL — REHEARING — MATTERS OC-
CURRING SUBSEQUENT TO ORIGINAL APPEAL.

Where all the parties holding mortgages upon the property of a certain railway are before the court seeking foreclosure of their liens and a decree is rendered ordering sale of the entire property *in solido* and awarding priority to one of the mortgagees, a reversal of the decree, to the extent of adjudging that another mortgagee is entitled to an exclusive lien upon a portion of the property, would not affect the title of a purchaser under foreclosure sale nor nullify that portion of the decree directing a sale of the property as an entirety, but would merely affect the rights of the parties in the application of the proceeds, which was the real contention between them.

The supreme court will not by its order attempt to direct the action of the superior court upon the rights of parties in regard to facts occurring subsequent to an appeal, and which the lower court has not had an opportunity, or been moved, to pass upon.

Appeal from Superior Court, Pierce County.—Hon. W. H. PRITCHARD, Judge. Reversed.

*O. F. Paxton,* and *Burke, Shepard & McGilvra,* for appellant:

At common law a mortgage of after acquired property was void. In equity, however, where the mortgage relates to some particular property described therein, which, though not in existence, must be reasonably certain to come into existence, and the mortgagor has a present actual interest concerning it, a mortgage of future-acquired property is sustained. But specific terms in the mortgage indicating an intent to pass after acquired property are necessary. No such intent is presumed. It must be expressed. And, in determining what property does or does not pass, due regard must be had to the maxim, *expressio unius est exclusio alterius. Morrill v. Noyes,* 56 Me. 458 (96 Am. Dec. 486); *Brainerd v. Peck,* 34 Vt. 496; *City of Bath v. Miller,* 53 Me. 308; *Farmers' Loan & Trust Co. v. Bank,* 11 Wis. 208; *Farmers' Loan & Trust Co. v. Bank,* 15 Wis. 424 (82 Am. Dec. 689); *Montgomery v. Chase,* 30 Minn. 132; *Phillips v. Both,* 58 Iowa, 499; *Lormer v. Allyn,* 64 Iowa, 725; *McArthur v. Garman,* 71 Iowa, 34; *Moody v. Wright,* 46 Am. Dec. 712, note; *Hamlin v. Railway Co.,* 4 Am. & Eng. R. R. Cas. 511, note; *Smith v. McCullough,* 104 U. S. 25.

*Doolittle & Fogg,* for respondent:

A corporation has power to mortgage its railroad and any subsequent accessions or accretions properly appertaining thereto, acquired either by itself or any successor in title, whether the road be then maintained and the property acquired by virtue of the original franchise or by virtue of some similar franchise granted by the same sovereign. *Compton v. Jesup,* 15 C. C. A. 397.

The opinion of the court was delivered by

GORDON, J.—This cause was before the court at the January term, 1896, and was reported in 14 Wash. 349 (44 Pac. 867). A petition for re-hearing was filed by the respondent, in which, among other things, it was stated that that part of the former opinion of the court to which the petition for re-hearing was directed was " based and predicated upon a mistake of fact and upon the assumption that the Lewis mortgage covers poles, wires and electric equipments, south of South Ninth street." Continuing, the petition further states: " If such were a fact then the conclusion reached by your honors would necessarily be correct." Upon consideration of the petition for re-hearing the following order was made: " Ordered that a re-hearing be granted in the above entitled cause on the point as to whether or not the John C. Lewis mortgage covers any other or different line of railroad than that from Point Defiance  to South Ninth street in the city of Tacoma, and that this cause be set for argument at the October term." What the court really intended by the order was to direct argument to the question of whether the Lewis mortgage covered *any property* which was not covered or embraced within the terms of the Hinchman mortgage, it being the contention of the respondent throughout his petition for re-hearing that the property embraced within the two mortgages was identical. It may be conceded that, so far as real property was included or embraced within the terms of either mortgage, it was confined to the line of railway *north* of South Ninth street. At the time when the Hinchman mortgage was executed the maker of that mortgage— the Point Defiance Railway Company—owned no property south of South Ninth street, and so far as the record discloses, it never was any part of the purpose or intention of that company to secure by purchase or otherwise

26—17 WASH.

any line of railway extending south of that street. It had, in addition to the line which it was then operating, surveyed and purposed extending its line northerly from the north end of its road as then operated, and this extension was thereafter completed; and we have held in our former opinion, and still adhere to the conclusion reached in that regard, that such extension was fairly included within the terms of respondent's mortgage. But the Lewis mortgage was made at a much later date, by a new company which had not only acquired all of the property owned by the maker of the Hinchman mortgage, but in addition thereto had in the meantime acquired by purchase an additional line of railway of several miles in length, known as the Wapato Park Belt Line, all of which was south of South Ninth street. We quote from the testimony of Stuart Rice, one of respondent's witnesses:

" Question: What is the fact about the Point Defiance, Tacoma & Edison Company purchasing certain railways after it bought the railway of the Point Defiance Railway Company?

"Answer: We purchased another line of railway at the same time, but none afterwards.

" Q. What was the other line of railway?

"A. That was the Wapato Park line of railway.

" Q. That road connects with the line of railway we have been discussing here, does it not?

"A. It does, through the Tacoma Railway & Motor Company's line; yes, sir.

" Q. That is known as the *south end*?

"A. Yes, sir; spoken of as the *south end*.

" Q. And the line in controversy here is called the north end?

"A. Yes, sir."

The Wapato Park Belt line, which was purchased at or about the same time as the other, was at the time of the purchase operated solely by steam power, whereas the Point

Defiance railway was at the time of its purchase in part operated as an electric street railway; that is, about one and one-half miles was being so operated, and the balance thereof was being equipped for operation as an electric street railway.  Shortly after purchasing these two theretofore independent lines of railway, the Point Defiance, Edison & Tacoma Railway Company, the then owner of both roads, entered into contracts with the Northwest General Electric Company and the Edison General Electric Company for cars, motors and other appliances needful and necessary in operating an electric road, and the construction of a distribution circuit and equipment for *thirteen* miles of track.  These contracts were made subsequent to the time of acquiring both roads and all cars and motors so purchased were afterward operated upon the entire line of road, both north and south of South Ninth street.  In other words, between Edison, the south end of the system, and Point Defiance Park, the north end of the system.  Just when this consolidation took place, or when the new company commenced to run its cars over the entire system, is, we think, entirely immaterial.  It is enough that it did so prior to the execution of the Lewis mortgage—and that mortgage, contrary to the contention of the respondent, includes within its terms—

" all passenger cars, both open and closed (supposed to be twelve or more in number), freight cars (of which there is supposed to be one or more), construction cars, flat cars, car bodies, trucks, including both those on which cars are now mounted and those on which none are now mounted, motors now in use for operating said cars and motors designated for such use but not now in use therefor, and all trolleys, trolley stands, controllers, rheostats, car wires, car fixtures, lamps, spare parts, tools and instruments, and, in fact, everything pertaining to the complete electrical equipment of said cars now owned by said party of the first part and used or intended for use, wholly or in part, on either or

any line or lines of street railway owned, leased or operated by said party of the first part, *whether* the line or lines of street railway on which *such cars or electrical equipments* thereof or any thereof *are used*, lie northerly *or southerly of said South Ninth street*, in said city of Tacoma, or wheresoever such cars or electrical equipments thereof may lie or wherever the same may be used."

The testimony of Mr. Hurley, the receiver, shows that at the time he took possession, viz.: May 8, 1894, the cars were being operated both north and south of South Ninth street.   He testified that they were being " indiscriminately run " over the whole line.   Also:

" Question: The cars in other words were running through from Point Defiance Park to the south end of the system?

"Answer: Yes, sir.

" Q. There is a road running south of South Ninth street which forms really a part of the Point Defiance road, is there not?

"A. Yes, sir.

" Q. How does that run, and what is its terminal point?

"A. Edison.   It runs to Edison.

" Q. And at that time you took possession of the property which you describe they were running the cars clear through from Point Defiance Park to Edison?

"A. Yes, sir."

The decree directed that all of the property be sold as an entirety, and it is urged by the respondent that inasmuch as no appeal has been taken from that part of the decree, and appellant did not demand a separate sale of the property on which he claims an exclusive lien, that the relief which he seeks should not be granted, for the reason that it would nullify those parts of the decree from which no appeal was taken.   We do not think that a reversal would affect the title of the purchaser, and what appellant is concerned in is the application of the fund derived from the

sale. Each party was before the court seeking a foreclosure of his mortgage. It was proper enough that the entire property should be sold *in solido*. All parties were seeking to have it sold, the real contention being the application of the proceeds. In this connection the appellant has asked us to direct the court below to take proof as to the value at the time of the sale of that part of the property sold upon which the appellant was entitled to an exclusive lien, and to ascertain the respective values upon such proof, and to thereupon award appellant, as trustee, a personal judgment against respondent Hinchman, for such proportion of the amount for which the entire property was sold at said sale as will bear the same ratio to said entire amount which the value of said property, upon which appellant was entitled to an exclusive lien, would bear to the value of the entire property. We think we would not be justified in making such direction. We are not called upon in this case to, nor can we properly, notice any proceedings taken below since this decree was entered and the appeal was taken. The present investigation must be confined to the record now before us, from which we must determine whether the decree was or was not erroneous. The rights of the parties upon facts occurring subsequent to the appeal cannot become the subject of the present investigation, and in the exercise of its appellate function this court will not direct the superior court to proceed to act unless that court has first had an opportunity to proceed— as the law presumes it would upon request—in accordance with law. If appellant is entitled *in the present proceeding* to the relief he now seeks, it is to be presumed that the lower court will, upon request, grant it. We hold that it is a question not presented by the appeal in the present instance. Therefore we decline to express any opinion upon the subject of whether appellant is or is not entitled thereto.

After a full review of the entire record, we are satisfied that the conclusion reached in the former opinion was right, and we adhere to it with this modification, viz.: that the appellant will not be entitled to a priority of lien upon any of the poles, wires or overhead equipment upon the line of railway north of South Ninth street, but as to the trucks, motors, cars and other electrical equipments purchased by the Point Defiance & Edison Railway Company subsequent to the execution of respondent's mortgage, our conclusion is that appellant is entitled to a decree establishing the lien of his mortgage as a first lien thereon, and the cause will be remanded to the superior court for further proceedings in accordance herewith.

SCOTT, C. J., and ANDERS and REAVIS, JJ., concur.